EXHIBIT

1

***EFILED***
Case Number 2021L 000260
Date: 2/26/2021 4:27 PM
Thomas McRae
Clerk of Circuit Court
Third Judicial Circuit, Madison County Illinois

**IN THE CIRCUIT COURT OF THE THIRD JUDICIAL CIRCUIT**
**MADISON COUNTY, ILLINOIS**

CRUMLEY ROBERTS, LLP and )
BURKE HARVEY, LLC )
       )
       Plaintiffs, )
       )  Case No.   2021L 000260
       v. )
       )
HENINGER GARRISON DAVIS LLC )
       )
       Defendant. )

## COMPLAINT

Come now the Plaintiffs, Crumley Roberts, LLP and Burke Harvey, LLC, by counsel, and for their Complaint against Defendants Heninger Garrison Davis, LLC as follows:

### NATURE OF THE CASE

1.     The Plaintiffs and Heninger Garrison Davis, LLC ("HGD") are law firms which agreed to work together on an agricultural litigation case (the "Syngenta Case") and to share the resulting fees. The Syngenta Case has now settled, the majority of the legal fee awards have been made by the various courts involved, and HGD has refused to honor its legal fee agreement with Plaintiffs.

### PARTIES

2.     Plaintiff, Crumley Roberts, LLP ("Crumley Roberts" or "CR") is a law firm organized as a limited liability partnership. Its principal place of business is in Greensboro, North Carolina.

3.     Plaintiff, Burke Harvey, LLC ("Burke Harvey" or "BH") is a law firm organized as a limited liability company. Its principal place of business is in Birmingham, Alabama.

4.     Defendant, Heninger Garrison Davis, LLC ("Heninger" or "HGD") is law firm organized as a limited liability company. Its principal place of business is in Birmingham, Alabama.

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction over this matter. Venue is proper in this Court as the agreement that is at issue was to be performed in this County and some of the acts giving rise to the breach of contract occurred in this County.

## STATEMENT OF FACTS

6.     In late 2014, China, the largest importer of corn grown in the United States, imposed a ban on any importation of U.S. grown corn. Just prior to the ban taking affect, U.S. corn prices per bushel were at historic highs. The closing of the Chinese market to U.S. corn resulted in surplus corn being available on the U.S. market which, in turn, caused the price per bushel to plummet, economically harming farmers. The Chinese ban was implemented on the assertion that genetically modified corn grown in the U.S. from Syngenta's, a Swiss entity, MIR162 trait (seed) had not been approved for importation to China by the Chinese Government. Indeed Syngenta, before obtaining approval for import to China, sold and encouraged U.S. farmers to plant corn using seeds containing the MIR 162 trait. Because of this, the US corn supply chain became comingled with both approved and unapproved GMO corn. When this comingled corn was shipped to China, the unapproved GMO marker was detected and all U.S. corn was rejected by the Chinese government. Thereafter, multiple lawsuits were filed throughout the United States in both state and federal court against Syngenta relating to its conduct in allowing a genetically modified variant of its corn seed to infiltrate and contaminate the United States' domestic corn supply before obtaining proper governmental approval. These lawsuits alleged Syngenta's actions

resulted in the above-mentioned ban and resulting price reduction.  Eventually, a multidistrict litigation proceeding ("MDL") was established in the United States District Court for The District of Kansas.  Other litigation against Syngenta was consolidated in Minnesota state court and, as discussed below, in the Southern District of Illinois.

7.     As the litigation against Syngenta unfolded, Crumley Roberts, Burke Harvey and Heninger Garrison Davis decided to work together and jointly prosecute litigation against Syngenta.  Beginning in October of 2014, William L. Bross of HGD contacted Brian Kinsley of CR to discuss working together on Syngenta cases.  Later W. Todd Harvey, of BH, William L. Bross and Brian Kinsley, agreed to have their three respective firms work together to represent Plaintiffs against Syngenta.  At that time, the three firms agreed to split all legal fees received from their collective efforts equally, one-third each after first deducting any referral fees to a referring law firm outside of their team.

8.     At the outset of the agreement, CR, BH, and HGD agreed to split the work load in the litigation against Syngenta.  As the litigation unfolded, the work of the Plaintiffs was more focused upon recruiting and servicing the clients as directed by HGD who took a leadership role on behalf of the Team in the underlying litigation.  The work of HGD was more focused upon dealing with the Court and the Defendants. Notwithstanding the differing kinds of contribution and roles of the parties, the fees were to be divided based upon the agreement discussed below.

9.     On or about the end of 2014, and through the beginning of 2015, the parties orally reaffirmed, during meetings, telephone calls and while traveling together their oral agreement to split all of the Syngenta legal fees by thirds with one-third of such fees going to each firm after any referral or other firms were paid.

10.      As set forth above, the fee agreement in the Syngenta Case, was to split the total legal fees, after first deducting any referral fees to firms other than the Plaintiffs and Defendant, one-third to each of the three firms.  The parties also agreed to split expenses, including advertising costs in newspapers and other media as part of their efforts to acquire clients.  Other efforts, including outreach to referring lawyers, as well as meeting directly with farmers all over the country, were undertaken by the three firms in order to establish a client base.  The three firms prepared and circulated to potential clients a promotional piece listing all three firms, a copy of which is attached hereto as **Exhibit A** and hereby incorporated by reference.

11.      The understanding that CR, BH, and HGD would jointly work the project and each have one-third interest never changed, was reaffirmed several times, and was never modified.

12.      In furtherance of the agreement, the three firms vetted out various jurisdictions, including the MDL, Minnesota and North Carolina before eventually deciding on a strategy to file their clients' claims in Illinois state court.  All three firms signed the *Poletti*, *Brase*, and *Wiemers* Illinois state complaints, the principal cases which established a hub for the litigation in Illinois. Defendants later removed those cases to the United States District Court for the Southern District of Illinois and they were consolidated under *Poletti*.  Pursuant to these combined efforts, an additional front in the Syngenta litigation was thereby opened in Illinois. The Illinois aspect of the overall litigation contributed substantially to the overall settlement in all actions against Syngenta.

13.      The various courts overseeing the different centralized litigations had litigants enter into agreements whereby discovery information could be shared amongst them. At that point, lawyers from HGD, CR, and BH were already active in the Illinois litigation.  Lawyers from these firms attended hearings, did deposition preparation, attended depositions, and reviewed various document productions.  Lawyers and staff from CR and BH assisted HGD with the completion of

fact sheets and gathering documents from clients, all to the contribution of the CR\BH\HGD team and in the furtherance of the litigation.

14.     In addition to the foregoing tasks, CR and BH continually requested additional work and further involvement in other litigation aspects of the Syngenta Case.  In reply, HGD continued to exhort CR and BH to continue their efforts on acquiring additional cases for the Team all the while assuring CR and BH that their efforts would be to the benefit of the CR\BH\HGD Team, and that the Plaintiffs would be compensated per the Agreement.

15.     Lawyers from CR and BH continually pressed William L. Bross, a partner at HGD, about the one-third agreement and were constantly assured that the original "deal" or Agreement the three firms entered into on or about the beginning of 2015 was in full force and effect.  CR and BH were also told that a written memorandum to this effect would be forthcoming, though one was never received. See, for example, the emails in **Exhibit B**, attached hereto and hereby incorporated by reference

16.     On or about April 10, 2018 Syngenta reached a preliminary, global settlement of the underlying litigation which was finalized by order dated May 6, 2018.  This settlement included an overall amount to be paid as attorneys' fees, which amount then needed to be allocated among the different cases and different firms in each case. Throughout the settlement and fee award process, CR and BH had no reason to believe that the original fee agreement with HGD had changed, and it was CR's and BH's expectations that they would share equally one-third to each firm from all Syngenta fee awards to the Team.

17.     Eventually, approximately $33,859,233.33 was allocated as attorney fees to the augmented HGD team, which included the CR/BH/HGD Team, and also to a group consisting of six other law firms, to whom the Court awarded a small portion of the award.  Subsequent orders

by the Court and agreements between the parties reduced this amount to approximately $30,000,000.00 to the CR/BH/HGD Team. Pursuant to the Agreement set forth above, Plaintiffs are each entitled to approximately one-third of this sum.

## COUNT I
## BREACH OF ORAL CONTRACT

18.      CR and BH restate and reallege Paragraphs 1 through 16 of this Complaint as though fully set forth herein.

19.      The oral agreement between HGD, CR, and BH to split all of the attorney fees in the Syngenta Case (the "Agreement") constitutes a valid and enforceable contract.

20.      CR and BH duly and fully performed their obligations under the Agreement. All conditions precedent have been performed. (See Supreme Court Rule 133c.)

## COUNT II
## ACTION PURSUANT TO THE PARTNERSHIP ACT FOR DISSOLUTION, AN ACCOUNTING, AND DISTRIBUTION OF PARTNERSHIP ASSETS

21.      CR and BH restate and reallege Paragraphs 1 through 16 of this Complaint as though fully set forth herein

22.      Pursuant to Section 202(a) of the Uniform Partnership Act (1997) ("RUPA"), 805 ILCS 206/202(a), the association of the three firms to carry on the business of prosecuting the Syngenta Case forms a partnership.

23.      Pursuant to Section 801 of the RUPA, the partnership is to be wound up, its purpose being completed

24.      Pursuant to section 807 of the RUPA, Plaintiffs are entitled to distribution of their one-third each of the partnership's assets, which consist of the amount of the total fee award.

25.      Notwithstanding repeated requests, HGD has failed and refused to pay this amount to Plaintiffs.

## COUNT III
## BREACH OF CONTRACT IMPLIED IN LAW

26.     CR and BH restate and reallege Paragraphs 1 through 16 of this Complaint as though fully set forth herein.

27.     As part of the joint prosecution of the Syngenta Case, CR and BH performed substantial services pursuant to the Agreement, including to obtain clients for the litigation in the United States District Court for the Southern District of Illinois.

28.     CR and BH obtained clients for the Syngenta cases pursuant to the understanding that they would each receive one-third of the total fee; moreover, CR and BH did not render their services gratuitously.

29.     HGD accepted the services rendered by CR and BH by, among other things, incorporating the clients obtained by CR and BH into the litigation. Further, HGD knew that CR and BH rendered these services in the belief that it was doing so under the Agreement.

## COUNT IV
## EQUITABLE ESTOPPEL

30.     CR and BH restate and reallege Paragraphs 1 through 16 of this Complaint as though fully set forth herein.

31.     HGD unambiguously promised to split any fee received in the Syngenta cases with CR and BH with each receiving one-third of such fees.  HGD also unambiguously reassured the Plaintiffs that the agreement would be honored, that the agreement would be reduced to writing, and that the Plaintiffs would be compensated fairly.

32.     HGD further agreed to split with CR and BH the costs incurred by such parties for advertisements in various mediums and other efforts, such as outreach to referring lawyers and the expense of meeting with farmers throughout the country.

33.     CR and BH relied upon HGD's promise to split fees received in the Sygenta Case by undertaking efforts, and incurring significant costs, in connection with the advertisement of the Sygenta cases, outreach to referring lawyers, and conduct of meetings with farmers throughout the country.

34.     Given HGD's promise to split fees received, and costs incurred, in the Syngenta cases, the reliance of CR and BH was expected and foreseeable by HGD.

35.     CR and BH, as a result of their reliance upon the promise of HGD, incurred costs and expended considerable time to further the joint effort to prosecute litigation against Syngenta.

**COUNT V**
**PROMISSORY ESTOPPEL**

36.     CR and BH restate and reallege Paragraphs 1 through 16 and 30-34 of this Complaint as though fully set forth herein.

WHEREFORE, Plaintiffs, Crumley Roberts, LLP and Burke Harvey, LLC, respectfully request that this Court enter a judgment in their favor and against HGD in an amount such that each Plaintiff will receive of one-third of the total attorney's fees awarded to the parties hereto (net of referral fees to outsiders) and also plus prejudgment interest and grant them such other and further relief, including costs, as may be just and proper.

Respectfully Submitted,

CRUMLEY ROBERTS, LLP and
BURKE HARVEY, LLC

By:     /s/Christian J. Jorgensen
        Christian J. Jorgensen
        One of Its Attorneys

Christian J. Jorgensen (ARDC# 6243203)
Kenneth D. Peters (ARDC# 6186034)
Robert R. Tepper (ARDC# 2810190)
Dressler | Peters, LLC
70 W. Hubbard St., Suite 200
Chicago, IL 60654
Phone: (312) 602-7360
Fax:     (312) 637-9378
Email(s):  jorgensen@dresslerpeters.com
              kpeters@dresslerpeters.com
              rtepper@dresslerpeters.com

# EXHIBIT A

**From:** "Bill Bross " <<u>william@hgdlawfirm.com</u>>
**Date:** Thu Oct 27 12:02:39 EDT 2016
**To:** "Brian L. Kinsley" <<u>BLKinsley@crumleyroberts.com</u>>,"'Todd Harvey'" <<u>THarvey@burkeharvey.com</u>>
**Subject:** RE: Corn

Yes – will work on it



**William L. Bross**                         2224 1st Avenue North

Partner                                       Birmingham, AL 35203

Licensed in Alabama                          Tel:  205-326-3336

william@hgdlawfirm.com                    Toll Free:  1-800-241-9779

www.hgdlawfirm.com

Fax:  205-380-8072

BIRMINGHAM • ATLANTA • NEW JERSEY • NEW YORK



**Michael T. Brown, Jr.**
**Chief Operating Officer**

Crumley Roberts, LLP
2400 Freeman Mill Road
Suite 200
Greensboro, NC 27406
336-333-9899
866-827-0365

E-mail:   mtbrown@crumleyroberts.com
Web site: https://crumleyroberts.com

"Privileged and Confidential – This communication may contain confidential or legally privileged information and is intended only for the use of the individual or entity to whom it is addressed.  Any dissemination, distribution, printing or copying of this material by anyone other than the intended recipient is strictly prohibited.  If you have received this communication in error, please notify us immediately."

**From:** Brian L. Kinsley [mailto:BLKinsley@crumleyroberts.com]
**Sent:** Thursday, October 27, 2016 8:48 AM
**To:** Bill Bross <william@hgdlawfirm.com>; 'Todd Harvey' <THarvey@burkeharvey.com>
**Subject:** Corn

Gents:

Can we get a letter agreement regarding our agreement for our 3 firms to pool our Syngenta Case inventories and split net fees after expenses and co-counsel fees are deducted? In light of the Domina situation, I have been asked for this by my managing partner.  Bill – can you pull from previous agreements you have had with other firms to get one circulated?

Also do we need to have a corn meeting to discuss the implications of the Class Cert. in the MDL, our strategy moving forward on new cases that are coming in, redoubling our efforts to get more cases and overall direction we are heading in?  As always, if we can get the players in the room, I have no problem flying to Birmingham.

Let me know your thoughts.

BLK

**Brian L. Kinsley**

**Practice Group Leader Mass Tort & Products Liability**

Crumley Roberts

2400 Freeman Mill Road, Ste. 200

Greensboro, NC 27406

Tel.: (336) 333-9899

Fax: (336) 333-9894

E-Mail: blkinsley@crumleyroberts.com

Website: www.crumleyroberts.com

Privileged and Confidential-this communication and its contents are legally privileged information and is intended only for the use of the individual or entity to whom it is addressed.  Any dissemination, distribution, printing or copying of this material by anyone other than the intended recipient is strictly prohibited.  If you have received this communication in error, please notify us immediately.

**From:** "Bill Bross " <<u>william@hgdlawfirm.com</u>>
**Date:** Wed Nov 02 16:40:04 EDT 2016
**To:** "Brian L. Kinsley" <<u>BLKinsley@crumleyroberts.com</u>>
**Subject:** RE: Corn

Not forgotten you – I have no letters with anyone else. Will get you something though



**William L. Bross**

Partner

Licensed in Alabama

william@hgdlawfirm.com

www.hgdlawfirm.com

2224 1st Avenue North

Birmingham, AL 35203

Tel:  205-326-3336

Toll Free:  1-800-241-9779

Fax:  205-380-8072

BIRMINGHAM•ATLANTA•NEW JERSEY•NEW YORK



**Michael T. Brown, Jr.**
**Chief Operating Officer**



Crumley Roberts, LLP
2400 Freeman Mill Road
Suite 200
Greensboro, NC 27406
336-333-9899
866-827-0365

E-mail:   mtbrown@crumleyroberts.com
Web site: https://crumleyroberts.com

"Privileged and Confidential – This communication may contain confidential or legally privileged information and is intended only for the use of the individual or entity to whom it is addressed.  Any dissemination, distribution, printing or copying of this material by anyone other than the intended recipient is strictly prohibited.  If you have received this communication in error, please notify us immediately."

---

**From:** Brian L. Kinsley [mailto:BLKinsley@crumleyroberts.com]
**Sent:** Thursday, October 27, 2016 8:48 AM
**To:** Bill Bross <william@hgdlawfirm.com>; 'Todd Harvey' <THarvey@burkeharvey.com>
**Subject:** Corn

Gents:

Can we get a letter agreement regarding our agreement for our 3 firms to pool our Syngenta Case inventories and split net fees after expenses and co-counsel fees are deducted? In light of the Domina situation, I have been asked for this by my managing partner.  Bill – can you pull from previous agreements you have had with other firms to get one circulated?

Also do we need to have a corn meeting to discuss the implications of the Class Cert. in the MDL, our strategy moving forward on new cases that are coming in, redoubling our efforts to get more cases and overall direction we are heading in?  As always, if we can get the players in the room, I have no problem flying to Birmingham.

Let me know your thoughts.

BLK

**Brian L. Kinsley**

**Practice Group Leader Mass Tort & Products Liability**

Crumley Roberts

2400 Freeman Mill Road, Ste. 200

Greensboro, NC 27406

Tel.: (336) 333-9899

Fax: (336) 333-9894

E-Mail: blkinsley@crumleyroberts.com

Website: www.crumleyroberts.com

Privileged and Confidential-this communication and its contents are legally privileged information and is intended only for the use of the individual or entity to whom it is addressed.  Any dissemination, distribution, printing or copying of this material by anyone other than the intended recipient is strictly prohibited.  If you have received this communication in error, please notify us immediately.

# EXHIBIT B

# SYNGENTA CORN
# LAWSUITS



# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 2

CASE OVERVIEW ........................................................................................................ 4

    What is Syngenta Viptera Seed? ............................................................................ 4

    The History of GMO Lawsuits .............................................................................. 5

    Basis of the Claims against Syngenta .................................................................. 6

    How Syngenta Viptera Corn Has Harmed Americans ..................................... 8

    Pending Syngenta Corn Lawsuits ........................................................................ 8

YOUR ROLE IN THE LITIGATION ...................................................................... 10

FREQUENTLY ASKED QUESTIONS .................................................................... 11

    We did not plant Syngenta's Viptera or Duracade corn. Can we still file a claim?...... 11

    How is your firm different from the others with whom I have spoken? ......................... 11

    Who will handle my case? .......................................................................................... 12

    Won't I be better off with a "local" lawyer, close to home? ..................................... 12

    If my case is filed in another state, will I have to travel there? .................................. 13

    Will my case be part of a class action? ..................................................................... 13

    What is an MDL? ....................................................................................................... 13

    Is it better to be an MDL or in state court? ............................................................... 13

    We're not the type of people who sue; do we really need to file a lawsuit?................. 13

    Will it cost me anything if I lose? .............................................................................. 14

    How long do I have to make my decision? ................................................................ 14

    How long will it take to resolve my case?.................................................................. 14

# INTRODUCTION

Thank you for considering our law firms to represent of you, your family, and your farm in their claim for damages and lost profits associated with the precipitous decline in United States Corn Prices caused by Syngenta.

While Syngenta is generally a reputable company whose products are used by many farmers, the company did not act responsibly when it came to the marketing and sale of its Viptera and Duracade seed. It falsely represented to farmers that these genetically modified seeds, which contained the MIR 162 trait, were approved for export to China, a major importer of American corn. When concerns were raised by farmers as to whether the corn should be planted, Syngenta launched a "Plant with Confidence" advertising campaign suggesting that China's approval of MIR 162 was imminent. While some U.S. farmers remained skeptical, many planted Viptera and Duracade corn seed relying upon the advice of Syngenta's representatives. Unfortunately, China never approved corn containing the MIR 162 genetic trait for import, leaving the important Chinese market closed to many U.S. farmers.

When export shipments of corn were denied by China in November of 2013 owing to their testing positive for MIR 162, the price of corn dropped precipitously in the United States as the domestic corn market was flooded with corn that would have otherwise been exported. While only 3% of American agricultural fields were planted with Viptera and Duracade corn, contamination of the entire corn supply has been difficult to avoid due to the activities of Syngenta.

Further, throughout the distribution process, corn is comingled and mixed prior to shipment, rendering otherwise exportable corn, no longer able to be exported. Even trace amounts of MIR 162 have resulted in the denial of entire corn shipments when they arrive in China. Such cross-pollination and cross-contamination has resulted in the inability to export millions of tons of corn to China. Instead of exporting the corn it is being discounted in the United States, substantially dropping the price of ALL corn, not merely corn containing the offending MIR 162 trait.

Syngenta's actions have affected not only the price of corn grown with the Viptera and Duracade seed, their actions have caused a drop in ALL United States corn prices, causing significant losses to farmers, even those who did not grow corn using the offending seed.

As such, anyone who has sustained loss as a result of falling corn prices in the United States is eligible to file file a claim against Syngenta. Specifically, independent farmers, large farms, grain elevators, distributors, and exporters may all qualify to file a Syngenta lawsuit. BOTH farmers who planted Viptera and Duracade corn, as well as those who did not use that seed, have legal grounds to pursue a claim.



In terms of damages, there are many factors affecting corn prices, and many unrelated factors to which Syngenta will point, claiming that the drop in price is not their fault. For instance, things such as an increased number of acres planted, good weather conditions and a robust harvest this year have somewhat reduced corn prices this year. However, Syngenta is responsible for the drop in price associated with the glut of corn in the United States, caused by the inability to export to China. It will be the job of our Agricultural Economists to review all the factors affecting corn pricing and assess the precise drop in price caused by the actions of Syngenta.

Factors affecting corn prices and losses can vary from farm to farm, region to region. Indeed, owing to the multitude of unique factors affecting each farm's losses, it is best that each farmer be individually represented in order for their particular situation to be independently assessed. We appreciate your contacting our firms and trusting us to investigate your claim.

3

# CASE OVERVIEW

## WHAT IS SYNGENTA VIPTERA™ SEED?



Viptera is a genetically-modified (GM) corn seed designed to protect corn plants from a range of common pests, including black cutworms, corn earworms, dingy cutworms, and western bean cutworms. Agrisure Viptera was the first non-crystalline (non-Cry) protein approved for insect control. Otherwise known as a Vip toxin, Viptera seed features an insecticidal protein that can be traced to the bacterium Bacillus thuringiensis (Bt).

Both Cry and Vip proteins are designed to target specific organisms and are used in tandem to ward off a range of pests. When a pest that is susceptible ingests either a Cry or Vip toxin, the toxin binds internally with the mid-gut receptors. The result is the death of mid-gut cells, which leads to a rupture of the gut and kills the insect. The Vip3a toxin is specific to Viptera seeds and is combined with other Bt traits to control a wide range of corn pests.

Viptera corn seed was released in 2009 following 5-7 years of research by Syngenta. The seeds were approved by the USDA in 2010 and were first sold to American farmers in 2011. Agrisure Duracade™, a second generation version of Viptera, was distributed for the first time during 2014.

This GM corn variant is appealing to farmers because MIR 162 offers protection from certain pests. However, several Viptera corn lawsuits already underway in federal courts say the company downplayed China's stance on the genetic variant and its role as an importer of U.S. corn. When Viptera corn hit U.S. markets in 2011, China had not yet approved the product and had adopted a zero-tolerance policy toward MIR 162 until further notice.

In order to encourage farmers to use the corn in spite of China's position, Syngenta launched an advertising campaign dubbed "Plant with Confidence". A fact sheet available through the company's website stated that most U.S.-grown corn is used domestically and inferred China's approval of MIR 162 was imminent. While some U.S. farmers remained skeptical, many planted Viptera corn seed.

To date, China has not approved MIR 162. Contrary to Syngenta's claims, the USDA reports that 20% of American corn is exported and and China has recently become one of the largest importers of U.S. corn. In a move that signals China may never approve MIR 162, the country announced a discontinuation of its own governmental program aimed at developing genetically modified corn and rice in August 2014.

# THE HISTORY OF GMO LAWSUITS

Farmers have found significant value in employing the technological advances provided by genetically modified organisms (GMO) to grow and sell crops, but years of profit-driven, unethical practices and subsequent litigation at the corporate level have repeatedly risked the livelihoods of everyone involved in the agricultural market. BASF, Bayer, Dupont, Dow Chemical Company, Monsanto and Syngenta, often referred to as the 'Big 6', are the largest GMO corporations in the agricultural input market (seed, pesticide and biotechnology industries) and have been at the center of a number of these lawsuits. These suits have uncovered much of how the monetary value of the affected foods, coupled with the worldwide reach of the industry's corporate influence, has been misused. The unethical trends at the top of the big business food pyramid are anything but new.

The direct modification of genes, known now as genetic engineering, began in the 1970's long after these companies were founded. However, these companies, all of which had a chemical background, found a way to use this scientific advancement to broaden their reach within the agriculture industry. These six corporations are now estimated to control anywhere between 60-70 percent of all food purchased in the nation. This share of the market was not free of controversy, and a lack of respect for farmers and international law has time and time again caused these multi-billion dollar conglomerates' market-wide influence to pinch smaller entities such as farmers and distributors.

GMO lawsuits have gone in both directions, from Big Ag filing lawsuits against smaller entities, to farmers and distributors filing suit against the global corporations. Monsanto has become notorious for generating bad press. Since its seed-development boom in the mid-1990s, Monsanto has sued over 125 individual farmers for either breach of contract or patent infringement in relation to the seeds they produce, claiming that patented seeds are planted without reimbursing the company for investments it took to develop the organism. The problem that has continually arisen with this approach is the burden of proof that lies on the farmers to prove their innocence. Farmers have repeatedly claimed and produced evidence that the sheer volume of Monsanto's seeds being used across the country has led to cross-contamination of their land and crops, and that farmers should not be held liable for an accidental produce confluence that tested positive for Monsanto's patent.

On the flip side, many of the plants designed by the big GMO companies in the early days of genetic engineering continue to contaminate farmers' land and affect their current crops. A farmer in Oregon found a strain of wheat on his land that he discovered was resistant to Roundup weed killer in 2012. This Monsanto strain was tested between 1998 and 2005, and is no longer in use by the company or desired in the agricultural market. The discovery of this wheat and other farms with similar strains caused a host of countries to postpone U.S. wheat imports, leaving the farmers with a wasted crop on their hands that the corporation had irresponsibly produced and abandoned years before. Farmers filed GMO lawsuits in such cases in order to recover their losses.

Other Big Ag companies have been involved in similar GMO lawsuits. Dow Chemical Company

is accused of knowingly making available the pesticide DBCP, which sterilized thousands of farm workers permanently. BASF was fined for 673 violations of pesticide laws in 2001 alone. Migrant farm workers sued DuPont in August of 2014 for underpaid wages, and the company has reportedly hired police officers to inspect farmer's fields for withholding seeds or violating the terms of their contracts. To make matters more complicated, many states consider massive agricultural corporations as farmers, thus governing huge corporations with many of the same laws that are supposed to protect local farmers from corporate abuses.

One of the most recent and impactful points of litigation to come out of the Big 6 concerns the company Syngenta. In 2014, farmers in 11 states filed lawsuits against Syngenta. Syngenta is the world's largest seed purveyor with sales of $14.7 billion in 2013. Corn grown from Syngenta Viptera and Duracade seed is being rejected by Chinese import authorities, contaminating massive export shipments with the genetic modification MIR 162. As a result of cross-pollination and mixing during the distribution process, the majority of American corn is being rejected by China. The logjam of rejected corn has caused a huge hole to form in the domestic and export market, resulting in a price drop which has caused major losses to farmers and grain companies across the nation.

## BASIS OF THE CLAIMS AGAINST SYNGENTA

Farmers, grain distributors, grain elevators, and corn exporters throughout the nation are filing lawsuits against Syngenta to recover losses resulting from Syngenta's promotion of Viptera corn seed. Viptera corn lawsuits that have already been filed allege that Syngenta, a global agribusiness, engaged in a marketing campaign which purposely misled farmers, urging them to use genetically modified Agrisure Viptera and Agrisure Duracade corn seed prior to the products' approval for import by China. Viptera lawsuits assert that in choosing to bring Viptera corn seed to market prior to approval by China (a major importer of U.S. corn), Syngenta crippled the American corn market.

Since November 2013, China has rejected entire shipments of corn that test positive for any trace of Viptera. As a result, domestic corn prices have fallen across the board and the U.S. has lost a significant export market. Furthermore, much of the U.S. corn supply has been contaminated by Viptera and Duracade, through cross-pollination in the fields and consolidation of corn crops in grain elevators. The presence of Viptera and Duracade corn has resulted in widespread market instability and a huge loss of revenue for the American corn industry. To date, plaintiffs in Syngenta GMO lawsuits are claiming $1.14 billion in losses in federal courts, and the National Grain and Feed Association (NGFA) estimates that farmers, distributors, and exporters may face as much as $3.4 billion in losses in the 2014-2015 season. A realistic fear has surfaced that the GMO trait in question, MIR 162, will surface in other crops. The economic effects of Syngenta's actions will continue to harm American corn farmers, distributors, and exporters for years to come.

Syngenta, a Swiss agribusiness which operates in 90 countries across the globe, reported annual sales of $14.7 billion during 2013. Syngenta allegedly invested 5-7 years and $200 million into developing the genetic modification known as MIR 162 that distinguishes Viptera and

Duracade seeds. Despite being aware that China had not yet approved GMO corn grown from seeds featuring MIR 162, Syngenta launched marketing campaigns designed to encourage farmers to plant Viptera seeds. These lawsuits against Syngenta assert that Syngenta willfully misrepresented the situation, implying that China was on the cusp of approving Viptera corn, when in fact that has never occurred.

The entire corn industry, ranging from individual farmers to major exporters, has been harmed by the fallout from Viptera corn. Large agricultural companies such as Cargill, Trans Coastal Supply Co. and Bunge North America are already involved in Viptera corn lawsuits. Farmers are filing class action lawsuits against Syngenta, seeking to recover their losses and halt the production and marketing of Viptera MIR 162 corn seed. In addition, individual farmers need to join forces, for it is not fair that the American farmer should have to bear the brunt of Syngenta's actions.

## CLAIMS AGAINST SYNGENTA INCLUDE THE FOLLOWING:

**Disregard for Export Market** - Syngenta manufactured, marketed and sold Agrisure Viptera and Agrisure Duracade corn seeds featuring the genetic trail MIR 162, even though the product had not been approved by China, one of the U.S.'s top export markets.

**Misrepresentation** - The company made claims that China was on the cusp of approval MIR 162 corn, when in fact China has maintained a zero-tolerance policy for this particular GMO. Furthermore, Viptera and Duracade advertising included statements that downplayed the importance of China as an importer of U.S. corn.

**Contamination** - Corn is inevitably comingled in grain elevators and during the distribution and export process. It is impossible to prevent non-GMO corn from being contaminated with MIR 162. Further leading to damage is the fact that Syngenta encouraged farmers to plant Viptera seed side-by-side with other corn, resulting in contamination through cross-pollination.

**Destruction of the U.S. Corn Market** - The presence of MIR 162 has resulted in China rejecting entire shipments of corn that contain a trace of Duracade or Viptera corn, with the following results (according to the National Grain & Feed Association):

- Exports of corn to China have dropped by approximately 85%.
- Between November and August of 2013, farmers, distributors and exporters suffered $1.14 billion in losses as a result of Viptera corn and Duracade corn.
- NGFA estimates losses for the coming season to total as much as $3.4 billion.

7

Farmers have already faced major losses as a result of the presence of Viptera corn in the United States, and experts suggest depressed corn prices will haunt the market for some time to come. One-fifth of American corn is grown for export, and China is a leading market for corn exports. China's share of the U.S. export market was projected to rise in the coming years, but shipments are now being routinely denied due to the presence of presence of corn containing the MIR 162 trait.. The economic damage of Syngenta's MIR 162 corn seed is expected to continue into the future, and American farmers should not have to eat the losses caused by Syngenta's negligence.

## HOW SYNGENTA VIPTERA CORN HAS HARMED AMERICANS

Experts estimate that Viptera seeds have been planted on 3% of U.S. agricultural acreage. While only a small margin of the overall corn crop, the presence of Viptera seeds has resulted in contamination of the U.S. corn supply, from cross-pollination in the fields and comingling in grain elevators. Trace elements of Viptera corn are enough to contaminate an entire export shipment of grain.

USDA reports indicate that the U.S. sold five million tons of corn to China between 2012 and 2013, which makes China a leading exporter of American corn. In 2013, China began rejecting shipments of U.S. corn when they tested positive for MIR 162, the genetic trait in Viptera. The National Grain and Feed Association (NGFA), the trade organization for grain elevators in the U.S., reported in April of 2014 that China had denied corn shipments totaling 1.45 million tons, causing $427 million in lost sales. Shipments have continuously been rejected for even a trace presence of Viptera corn.

Syngenta corn lawsuits blame the company for a variety of economic losses resulting from Viptera seeds. Estimates show that the presence of MIR 162 in the U.S. export supply has caused Chinese demand for U.S. corn to fall by 85%, decimating a major export market now and into the future. The effects of this damage are even more widespread as domestic corn prices have fallen dramatically, according to the NGFA. The trade organization estimates that collectively, corn growers, distributors and exporters suffered $1.14 billion in losses between November and August of 2014. The corn industry is expected to suffer even more during the 2014-2015 season, with estimates reaching $3.4 billion in losses. Farmers of other grains, such as soybeans, worry the genetic trait MIR 162 may surface in other crops and lead to further losses.

## PENDING LAWSUITS AGAINST SYNGENTA

Cargill, one of the main food conglomerates involved with the corn trade, is one of the major players involved in the lawsuits and claim that Syngenta's failures to verify their corn crop with China has already cost the U.S. grain industry up to $2.9 billion as of October 27, 2014. Numerous corn distributors and exporters have been refusing to accept Viptera corn from growers in order to protect export sales. In August of 2014, Syngenta sued Bunge in an effort to force the company to accept corn grown from Viptera seed. The case, Syngenta Seeds Inc.

v. Bunge North America Inc., 11-04074, was tried in U.S. District Court, Northern District of Iowa, Western Division (Sioux City). In September of 2014, Judge Mark W. Bennett ruled against Syngenta, saying "Bunge's decision to reject Viptera corn at all of its locations was a legitimate and reasonable business decision." Because China, a major exporter of U.S. corn, was routinely rejecting corn grown from Viptera seed, the judge stated that, "The injunction would impose prodigious costs on Bunge for a situation that Bunge did not create."

As a whole, the corporate culture that has developed around the agricultural input market has time and again proven to be predatory, cutting the sharpest corners at the expense of the farmers cultivating the lion's share of their products. The cost of their actions are felt hardest by the people most affected by the market fluctuations – the farmers, suppliers and exporters left with binding contracts with large corporations and a season's worth of unsellable crops. Filing lawsuits against Syngenta are the most effective means for individual farmers and domestic grain companies have to hold Syngenta accountable for the damage caused by Viptera and Duracade corn.

In addition, farmers in eleven states have filed class action lawsuits against Syngenta to recover losses related to Viptera and Duracade corn and to demand Syngenta pull the seed from American markets. Any farmer who has been impacted by falling corn prices or the inability to sell MIR 162 corn will automatically be included in that class action, assuming certification is granted.

At Heninger Garrison Davis, Crumley Roberts, and Burke Harvey, our plan is to represent each farmer individually, providing individual legal representations to each of the farmers we represent and address the particular circumstances associated with their loss. With these firms, you will not be an ignored number in a class action lawsuit; your claim will be handled by a lawyer who represents you, and is looking out for your best interests.



## YOUR ROLE IN THE LITIGATION

of your corn caused by Syngenta, regardless of whether you planted Viptera seeds. You have two primary avenues of legal recovery: (1) You can do nothing and likely be one of thousands of class members in a class action lawsuit; or (2) You can retain an attorney who will work with you to assess your damages and individually prosecute your claim. Either way, you will be a part of the litigation. The real question is which option is best for you.

We strongly believe it greatly benefits every farmer to have individual legal representation by a lawyer with whom they are comfortable, an attorney with whom they can work to assess their particular losses and reach a fair resolution.

Participants in class actions typically give up their right to bring an individual lawsuit. Class members generally play little or no role in directing the litigation. Due to their complexities, class actions often take much longer to resolve than conventional lawsuits.

Your case will not be part of a class action. While many others have also seen financial losses similar to yours, your case will always be handled on an individual basis. When resolved, your damages will be separately evaluated by our attorneys who will work with you in claiming the money to which you are entitled.

While some cases may be consolidated for the purpose of obtaining information and discovery from Syngenta in a more timely and cost effective fashion, such sharing of discovery would be for pretrial purposes only. If it would become necessary for your case to go to trial, your case would be tried separately and a jury would be asked to consider and resolve your case individually. Importantly, unlike a class action, we will keep you informed of the status of your case throughout the litigation process, working side by side with you to obtain a fair result.

Ultimately, the decision is yours. If you choose to retain our firm and obtain individual legal representation, there will be no out of pocket costs or expense to you. We are paid if and only if we are able to collect on your behalf. Our fee is simply one-third of what we are able to recover on your behalf, and then you reimburse any expenses incurred out of the settlement. In the event we are unable to recover on your behalf, you owe us nothing and have no obligation to reimburse any expenses.

We thank you for considering our firms. Enclosed in this packet you will find a Professional Employment Agreement and client questionnaire. To retain our firm, we ask that you sign the Employment Agreement and fill out the brief questionnaire as best you can so that we can get to work on your claim. Enclosed is a self-addressed stamped envelope for your convenience in returning the same.

## We did not plant Syngenta's Viptera or Duracade corn. Can we still file a claim?

# FREQUENTLY ASKED QUESTIONS

Yes. The actions of Syngenta not only affected those who planted Viptera and Duracade corn; they affected the entire corn industry. The actions of Syngenta caused a drop in corn prices across the entire United States market, resulting in substantial losses to the entire industry.

Anyone in the corn industry who has sustained losses as a result of Viptera and Duracade corn may be eligible to file a Syngenta corn claim. Specifically, independent farmers, large farms, grain elevators, distributors, and exporters all may qualify to file a Syngenta lawsuit. Farmers who planted Viptera corn, as well as those who did not, may have legal grounds to pursue litigation resulting from the drop in corn prices caused by Sygenta's inappropriate conduct. The effect of MIR 162 has been widespread across the entire domestic corn market and is expected to continue to hamper American corn exports and domestic prices into the future.

## How is your firm different from the others with whom I have spoken?

First, many law firms are filing class action lawsuits and are not specifically and separately evaluating the losses of each individual farm. We believe that the personal attention shown our clients, and the passion with which we pursue their claims, are second to none. We know that the economic stresses caused by Syngenta's actions are significant, and we always strive to treat our clients with the respect they deserve. Our attorneys are available to answer questions 24 hours per day.

Given the national nature of Agricultural litigation, we understand the difficulty faced in choosing a lawyer with whom you may not have met, or have had little prior contact. As such, we believe it is all the more important that our attorneys be accessible to answer your questions, regardless of when they might be asked.

Other firms often assign paralegals and legal assistants to fulfill the firm's critical responsibility to communicate with clients and answer their questions, which individuals may or may not know the details of either the litigation as a whole, let alone the details of your case. At Heninger Garrison Davis, Crumley Roberts, and Burke Harvey, we will give your claim the personal attention it deserves. We have a dedicated team of attorneys who are not only informed and active in the litigation, but will know the details of your case, and are accessible to answer your questions and address any concerns that may arise. We handle cases and clients, one at a time. We understand that each case and each client is different, and we will treat you with the respect you deserve.

Our primary goals are to ensure you get what you deserve and that Syngenta be held accountable for its actions. This is why we place the highest emphasis on customer service and communication.

## Who will handle my case?

Our attorneys will oversee and handle all aspects of your case. Any time you have a question



or concern, you will always be able to speak to an attorney. Our attorneys will never pawn you off on paralegals or legal assistants.

We care deeply about our clients and their cases, and personal attention has been the key to our firm's success. Our firm has substantial experience pursuing large multi-party national litigations against huge international corporations. This can only be accomplished by working hand in hand with our clients, and such cannot be accomplished when paralegals and legal assistants are left to do all the heavy lifting.

## Won't I be better off with a "local" lawyer, close to home?

The most important thing is that you hire a firm with which you are comfortable. However, to be justifiably comfortable, you need to be confident that the firm you hire has the expertise and resources necessary to ensure that you receive the compensation to which you are entitled. Unfortunately, "You only get one bite at the apple," and once your case is resolved, whether or not it is a good result, you do not get a second chance to try again with a better suited law firm.

The nature of agricultural litigation is such that litigations are national, not local in nature. Agricultural issues are complex, involve extensive expert testimony and are very expensive to pursue. Often, tens of millions of documents are produced by the agricultural companies in discovery, necessitating dozens of lawyers to review the documents and the expenditure of millions of dollars by national teams of attorneys, working together in the best interests of their clients.

The "local lawyer" is not always familiar with the details of these large national litigations, and often do not have the staff or financial resources to pursue such claims. Accordingly, it is important to seek a firm with the experience, resources and contacts best able to handle your claims. In fact, for this reason, many "local" lawyers ultimately end up referring these types of cases to our firm, and we welcome the opportunity to work with such local lawyers. In addition, one of the most important considerations in any agricultural case is where the case is filed and handled. Consideration must be given to all available courts, and a determination made on a case by case basis as to the best state or federal court in which to file each case. Simply filing a case in one location versus another can determine whether you win or lose.

As a national firm with contacts throughout the country, we have our finger on the pulse of all possible filing locations or venues. We have found that many "local" lawyers are unfamiliar with out of state options and often want to limit pursuit of your case to the "local" jurisdiction, even if this is not the most favorable place to file. As a firm with a national practice, we have

no such limitations and regularly file lawsuits in both state and federal courts throughout the country.

## If my case is filed in another state, will I have to travel there?

Probably not. These cases are handled by national, "non-local," firms on the defense side as well. Most of the time, they are willing to travel to you, if the need arises. Generally, the only time you would have to travel is if your case goes to trial, and our firm would front the travel costs in such a situation.

## Will my case be part of a class action?

With our law firm, no. Your case will not be part of a class action. In a class action, all claims are handled and resolved together and in the same fashion. For example, if a utility company "tacks on" $5.00 to each customer's bill without justification, a class action can be filed to recover everyone's $5.00. Everyone's damages are the same. By contrast, you have been injured by the actions of Syngenta. While many others have also been hurt by Syngenta's actions, your case will always be handled on an individual basis; and when resolved, your damages will be separately evaluated.

While cases are sometimes consolidated in order to obtain discovery from the responsible party in a more timely and cost effective fashion, such sharing of discovery would be for pretrial purposes only. If it would become necessary for your case to go to trial, your case would be tried separately and a jury would be asked consider and resolve your case individually.

## What is a MDL?

MDL stands for "multi-district litigation." It is a device of the federal courts whereby all federal claims involving a particular product are consolidated and transferred to a particular district (which may be in a different state) for pre-trial discovery. Once pre-trial discovery is completed, the cases are sent back to a federal court in the state where the case was originally filed for purposes of trial.

A MDL is not a class action. It is simply a device to simplify pre-trial discovery, and each case is resolved individually.

## Is it better to be a MDL or in state court?

It depends. State court cases are not subject to federal MDL proceedings. Sometimes the MDL is the best place to file, while other times state court is the superior venue. As a national firm, we are in a position to thoroughly analyze your particular case and make this determination. More often than not, the best place to file a lawsuit is not in the state where the client lives.

## We're not the type of people who sue; do we really need to file a lawsuit?

If your farm or your company has sustained economic losses as a result of Viptera corn, you will likely see the present situation continue into future years. Unless MIR 162 can be eradicated from the American corn supply – or China opts to accept the genetic modification – American farmers will be unable to sell corn to this major export market. Filing a Viptera corn lawsuit is the most effective means proponents of the corn industry, from small-scale



farmers to large distribution companies and exporters have to exert pressure over Syngenta. Unfortunately, in all too many cases it is only the fear of lawsuits, large settlements and verdicts that make a company become a better corporate citizen.

## Will it cost me anything if I lose?

No. Our firm fronts all costs and works strictly on a contingent fee basis. We only recoup our expenses if we win. If we do not recover for you, you will never owe us anything.

## How long do I have to make my decision?

Time is of the essence. Every state applies a statute of limitations to agricultural claims, and it is important that you act quickly to ensure that your attorneys have time to organize your case and obtain the necessary records before taking action. If you wait too long, the statute of limitations can expire, and your claim can be permanently barred.

## How long will it take to resolve my case?

It varies. We will do everything we can to resolve your case in an expeditious manner, but these are complex cases that do generally take a couple of years from beginning to end. We want to ensure that you get everything to which you are entitle, and we want to make sure that the responsible party is required to compensate you for all of your losses. While we always try to move our cases forward as quickly as possible, this is not a process that can be rushed.

Again, thank you for considering our firms. Enclosed in this packet you will find a Professional Employment Agreement and client questionnaire. To help us evaluate your case in a timely fashion, we ask that you sign the Employment Agreement, fill out the brief questionnaire as best you can, and return these to our office in the enclosed self-addressed stamped envelope.

If you have any questions, please do not hesitate to ask, for our attorneys are always available to offer help. We wish you the very best and look forward to working with you. Together, we can and will make a difference.



# HENINGER GARRISON DAVIS, LLC

## LEAD BY SERVING







CONTACT US:
1-800-411-0141