IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| IN RE: SYNGENTA AG MIR 162 | ) | MDL No. 2591 |
| CORN LITIGATION | ) | |
| | ) | Case No. 14-md-2591-JWL |
| This Document Relates To: | ) | |
| | ) | |
| *Crumley Roberts, LLP and* | ) | |
| *Burke Harvey, LLC v.* | ) | |
| *Heninger Garrison Davis LLC, et al.*, | ) | |
| No. 21-2261-JWL | ) | |
| _____ | ) | |

## MEMORANDUM AND ORDER
### AND
### FINDINGS OF FACT AND CONCLUSIONS OF LAW

In this single case within this multi-district litigation (MDL) plaintiff law firms Crumley Roberts, LLP ("CR") and Burke Harvey, LLC ("BH") assert contract and partnership claims against defendant law firm Heninger Garrison Davis LLC ("HGD"), by which plaintiffs seek to recover two-thirds of a common-benefit attorney fee award distributed to HGD. By counterclaim, HGD seeks a declaratory judgment by which the Court determines the shares of that award to which plaintiffs are entitled. The parties tried the case to the Court from November 6 to November 8, 2023, at which trial the parties presented evidence and the Court heard argument. The parties also submitted proposed findings and conclusions prior to trial. This Memorandum and Order constitutes the Court's findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52(a).

Based on the evidence and arguments presented, and as more fully set forth below, the Court finds that plaintiffs have failed to sustain their burden of proof with respect to

their contract and partnership claims, and HGD is awarded judgment on those claims.  On the declaratory judgment counterclaim, the Court concludes that plaintiff CR should receive a total of $1,300,000.00 from the common-benefit fee award, and that plaintiff BH should receive a total of $200,000.00 from the fee award; and judgment shall be entered accordingly.

## I.   **Background**

The following facts are undisputed.  In this suit, plaintiff law firms seek to recover from defendant HGD two-thirds of a common-benefit attorney fee award pursuant to an alleged oral agreement among the parties.  Specifically, plaintiffs allege that the parties agreed that they would work together to pursue litigation against Syngenta (the common defendant in the MDL) and that they would split "fees" equally among the three firms, one-third to each, after paying any referral fees.  The parties litigated individual actions against Syngenta on behalf of their clients, particularly in Illinois, but a global settlement of claims against Syngenta was reached and was subsequently approved by this Court, and a settlement class was certified.

The Court then awarded total attorney fees from the settlement fund in the amount of $503,333,333.33 (one-third of the total settlement).  The Court allocated those fees among four pools:  Kansas (49%), Minnesota (23.5%), and Illinois (15.5%) common-benefit pools, from which fees would be awarded for work that benefitted the entire settlement class; and an "IRPA" pool (12%), from which fees would be allocated among

individually retained private attorneys *pro rata* based on the ultimate recoveries by their claimant clients.  The parties to this action were assigned to the Illinois common-benefit pool.  HGD filed a joint application for an award of common-benefit fees, on behalf of the three parties and seven other firms (described collectively in the application as "Team HGD"), to the United States District Court for the Southern District of Illinois, to which the Court had assigned the initial task of allocating fees from the Illinois pool.  Ultimately, a total of $29,140,257.14 was distributed to HGD as common-benefit fees, but plaintiffs have not yet received any portion of that award.[1]

Plaintiffs claim that HGD has breached the parties' oral agreement by failing to divide that common-benefit award equally among the three firms.  HGD contends that the parties' agreement does not apply to the award of common-benefit fees.  In this action, plaintiffs assert a claim for breach of contract and a claim for dissolution, accounting, and distribution under the Illinois and Alabama partnership statutes.[2]

---

[1]  The parties stipulated to that amount.  An additional portion of the award has not yet been distributed to HGD.  Awards to the parties from the IRPA pool are not at issue in this case.

[2] The Court previously dismissed plaintiffs' equitable estoppel claim.  Plaintiffs also asserted a promissory estoppel claim, but they failed to address that claim either in their proposed findings and conclusions or at trial; accordingly, the Court deems that claim abandoned.  Finally, plaintiffs have asserted a claim under the Alabama Uniform Voidable Transactions Act against HGD and its individual owners, by which they seek to set aside any distributions of the subject fee award by HGD to its owners; but the Court granted the parties' request to bifurcate and stay discovery on that claim, which remains pending.

## II.    Claim for Breach of Contract

### A.    *Choice of Law*

Before addressing the merits of plaintiffs' claim for breach of contract, the Court must determine which state's law governs the claim.  In an MDL such as this, the Court applies the choice-of-law rules of the state in which the particular action was originally filed, *see Johnson v. Continental Airlines Corp.*, 964 F.2d 1059, 1063 n.5 (10th Cir. 1992), and thus the parties agree that the Court should apply Illinois's choice-of-law rules in this case to determine which state's substantive law governs plaintiffs' contract claim.  Illinois has adopted the choice-of-law analysis of the Second Restatement of Conflict of Laws.  *See Townsend v. Sears, Roebuck and Co.*, 879 N.E.2d 893, 903 (Ill. 2007).  Section 188 of the Restatement provides that a contract claim is governed by the law of the state with the most significant relationship to the transaction and the parties, with the following contacts to be taken into account, evaluated according to their relative importance with respect to the particular issue:  (a) the place of contracting, (b) the place of negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (e) the place of business of the parties.  *See* Restatement (Second) of Conflict of Laws § 188; *see also Townsend*, 879 N.E.2d at 903 (presumptively applicable law is selected under Section 188 in contract cases); *Eclipse Mfg. Co. v. U.S. Compliance Co.*, 886 N.E.2d 349, 357-58 (Ill. Ct. App. 2007) (citing Section 188 factors as potentially relevant factors for choice of law with respect to a contract claim).

HGD has argued in this case that Illinois has the most significant relationship to the claim because the parties' work on cases against Syngenta was primarily conducted in

4

relation to litigation filed in Illinois.  The Court concludes, however, that the Section 188 factors generally do not weigh in favor of applying the law of Illinois, but rather favor applying the law of Alabama (where HGD and BH were located) or North Carolina (where CR was located).  The witnesses at trial who entered into the oral agreement on behalf of the parties were not certain whether the agreement was actually made at a meeting in North Carolina, but those attorneys communicated with each other by email and by telephone around the time of the formation from their firms in Alabama and North Carolina.  Work recruiting clients and litigating the cases was performed from the parties' locations in those two states, where they also would have received and divided any attorney fees.  The dispute here concerns the division of common-benefit fees awarded to the parties, and that award was made by this Court in Kansas to the parties who had submitted a joint application from Alabama.  Accordingly, the Court concludes that Alabama has the most significant relationship to the transaction and the parties in light of the Section 188 factors.

The parties have agreed that Illinois courts see the need for a choice-of-law determination "only when a difference in law will make a difference in the outcome," *see Townsend*, 879 N.E.2d at 898; and they further agree that the choice here does not make a difference in resolving plaintiffs' contract claim, as the relevant states' law does not differ with respect to the general contract principles at issue.  Nevertheless, in evaluating this claim, the Court cites Alabama law, based on its determination under the applicable choice-of-law analysis.

B.   *Applicable Principles of Contract Law*

"Under general Alabama rules of contract interpretation, the intent of the contracting parties is discerned from the whole of the contract." *See Homes of Legend, Inc. v. McCollough*, 776 So. 2d 741, 746 (Ala. 2000). "The language of a contract . . . must be interpreted in light of all of the surrounding circumstances." *See Walls v. Bank of Prattville*, 575 So. 2d 1081, 1083 (Ala. 1991) (considering all evidence to determine whether a contract provision contained ambiguity). "The terms of an *oral* contract can be established through parol evidence, and a determination of those terms is for the trier of fact." *See Black Diamond Dev., Inc. v. Thompson*, 979 So. 2d 47, 52 (Ala. 2007) (emphasis in original) (citation and internal quotation omitted). Even if language of a contract is clear and suggests a single meaning, there may be a latent ambiguity if extrinsic evidence "creates a necessity for interpretation or a choice among two or more possible meanings." *See Walls*, 575 So. 2d at 1083. "If the language of a contract is ambiguous or uncertain, the surrounding circumstances, including the construction placed on the language by the parties, are taken into consideration so as to carry out the intention of the parties." *See id*. The party asserting a contract claim bears the burden of proving the existence and terms of the contract. *See Dunson v. Friedlander Realty*, 369 So. 2d 792, 795 (Ala. 1979).

C.   *Interpretation of the Contract*

The parties agree that they entered into an oral contract in late 2014, one term of which was that the parties would split "fees" equally, one-third to each firm. By their

contract claim, plaintiffs seek to recover two-thirds of the common-benefit fee award distributed to HGD (after payments to the other firms that joined the fee application), based on their argument that the scope of the oral agreement to split fees encompassed the award of common-benefit fees. If the agreement is interpreted to include such fees, then plaintiffs prevail on their claim for breach of contract, as it is undisputed that two-thirds of the award has not been paid to plaintiffs. HGD has not asserted any other specific contract defense in its proposed findings and conclusions. Accordingly, plaintiffs' claim turns on the interpretation of the fee term in the oral agreement.

Plaintiffs assert, and HGD does not dispute, that an oral agreement was formed in the course of discussions involving three men: Bill Bross of HGD, Brian Kinsley of CR, and Todd Harvey of BH. Plaintiffs claim that the parties agreed to split fees equally, meaning all attorney fees received of any kind, after referral fees were paid to other firms; and that the parties also agreed to divide equally expenses, decision-making, and litigation work with respect the overall litigation against Syngenta. HGD argues that the parties agreed in that oral agreement only to split contingent fees received from the parties' joint clients under contingent fee contracts with those clients (after payment of referral fees), and to share in the expenses incurred in recruiting those joint clients. HGD's position is that the agreement to split fees did not extend to the award of common-benefit fees by the Court.

To interpret the parties' oral agreement, the Court begins with the actual language of the agreement and its fee term. Although plaintiffs argue that the agreement

7

encompassed "all fees" of whatever type, there is no evidence that any such language was used in the formation of the contract.  When pressed on cross-examination regarding the actual language used, Mr. Kinsley testified that the three men agreed on behalf of their firms to split "the fees", and not necessarily to split "all fees".  Mr. Harvey insisted that the parties meant "all fees", but he eventually testified that he could not recall whether the three men referred to "the fees" or "all fees" in forming the oral agreement.  In fact, Mr. Harvey was quite evasive in answering questions concerning the actual words spoken in the formation of the agreement, which evasion undermined the credibility of his testimony on this and other issues.  Based on the testimony, the Court finds that the parties' oral agreement is best described as including an agreement to "split the fees," as there is no evidence to support any other wording.  The three men who formed the agreement all testified that "contingent" fees specifically were not mentioned at that time; nor were "common-benefit" fees discussed.  Thus, the Court finds that at most HGD agreed to split "fees", with no modifier or description of the type of fees.

The Court rejects plaintiffs' argument that the word "fees" unambiguously encompasses any and all types of attorney fees received or awarded at any time in the Syngenta litigation.  The Court is especially persuaded that the term is not unambiguous in light of the fact that the parties did not execute any written agreement, but instead merely agreed orally during the course of discussions; and the fact that Messrs. Kinsley and Harvey could not recall the exact words used in the formation or the oral agreement or even the exact time and place of that formation.  Even if the word "fees" without further

modification might be expected in some circumstances to include any fees, without limitation, the particular context and circumstances of the parties' entire agreement (as discussed below) must be considered.  In this case, the Court finds that the totality of the circumstances makes the agreement to split "fees" susceptible of more than one meaning – including the meaning that the parties were referring in their agreement only to contingent fees received pursuant to their joint clients' contingent-fee contracts with the three firms.

This is especially true in light of the documentary evidence introduced at trial. Plaintiffs' counsel conceded at trial that the complete story may best be determined from the documents.  The contract at issue was not in writing, however, and plaintiffs' interpretation that the agreement encompassed any future award of common-benefit fees to a party is not directly supported by any document.  The Court's findings are also based on the witnesses' testimony, considered in light of the Court's determination of their credibility, including based on the witnesses' demeanor and the manner and consistency of their testimony.  Finally, the same context and circumstances that render the parties' agreement capable of multiple meanings persuade the Court that the agreement should not ultimately be interpreted to encompass the award of common-benefit fees, and the Court thus finds that the parties agreed only to split contingent fees (or their equivalent).[3]

---

[3] As noted above, IRPA pool awards to the parties are not at issue in this case, and thus the Court does not express any opinion concerning application of the parties' agreement to such awards.

1.      <u>Context in Which the Agreement was Formed.</u>  The Court first considers the context in which the parties formed the oral agreement in late 2014.  Before that time, each plaintiff had had occasion to enter into fee-sharing arrangements with HGD, but those instances involved the sharing only of contingent fees; neither plaintiff identified any prior occasion in which it had agreed with HGD to divide common-benefit fees without regard to the actual common-benefit work performed by the parties.  It is clear that at the time of the formation of the oral agreement, client acquisition was the primary focus of Messrs. Bross, Kinsley, and Harvey.  As Lew Garrison of HGD aptly and credibly put it in his testimony, that is what these three men did – find and recruit clients for mass tort cases. The parties' emails from that time confirm that the first order of business for the three men was building a stable of clients to sue Syngenta.  Plaintiffs point to the fact that CR aided in the filing of one complaint in North Carolina, but again, the primary focus was on recruiting clients.

It is undisputed that the parties' agreement actually evolved from an agreement between HGD and CR to divide fees earned in Syngenta cases.  The original fee split arrangement was 60 percent for HGD and 40 percent for CR, and Mr. Kinsley conceded in his testimony that that agreement encompassed only contingent fees.  That agreement was changed to a 50-50 split before BH was included.  Plaintiffs argue that CR's share was increased because CR's contributions were changing to include a share of work litigating the cases.  Again, however, Mr. Kinsley conceded that the original agreement included only contingent fees.  He testified that the modified agreement included a 50-50 split of

10

"fees generated by the litigation," but there was no documentary evidence of that agreement introduced at trial, and he conceded on direct examination by his counsel that he and Mr. Bross did not discuss any particular types of fees in making that agreement. Thus, even if HGD and CR contemplated that greater contributions by CR would justify a higher share for CR, there is no basis in the evidence to find that the scope of the fees (i.e., contingent fees only) changed in that modification to a 50-50 split. Certainly Mr. Kinsley, in describing the modification, did not state in his testimony that the scope of the fees being split underwent a change.

The evidence at trial included emails among the parties that referred to agreements between the three and other referring counsel, by which referring counsel would receive a one-third share of fees, with two-thirds retained by HGD, CR, and BH. Mr. Kinsley conceded at trial that those agreements with referring counsel involved only a split of contingent fees, and that references in those emails to those splits were therefore to contingent fees only. Mr. Kinsley further conceded that the parties did not contemplate giving those referring counsel a share of common-benefit or other non-contingent fees. Thus, when the parties agreed orally to split fees after paying referring counsel, the fact that the referring counsel agreements were limited to contingent fees further supports the interpretation that the parties' oral agreement had the same scope.

The Court also notes that neither Mr. Kinsley nor Mr. Harvey specifically testified that at the time of the formation of the oral agreement, his specific intent or the intent of the parties generally was to split fees other than contingent fees, such as common-benefit

11

fees.  The Court finds that the weight of the evidence is that the parties were thinking only of contingent fees and simply did not contemplate splitting any other type of fees awarded. They certainly were not thinking about any possible award for common-benefit work performed only by one party.  This is not surprising because it is undisputed that the parties' intent at that time was to pursue individual actions against Syngenta, and not a class action. There is no evidence that any party contemplated a scenario in which it would not be able to collect on the parties' contingent-fee contracts with its clients.  Accordingly, the Court finds that at the time of the formation of their oral agreement, the parties did not contemplate splitting common-benefit fees or any type of fees other than contingent fees collected under client contracts.

2.    Attempts to Document the Agreement.    The Court does not agree with plaintiffs that subsequent attempts to document the parties' oral agreement favor plaintiffs' interpretation; rather, the evidence concerning those attempts favor limiting the agreement to contingent fees.

In a December 2014 email to Messrs. Harvey and Bross, shortly after the formation of the agreement, Mr. Kinsley described the agreement as follows:

> As we discussed, the 3 firms will be splitting the advertising costs equally and the fees 1/3 per firm.  Let's all hope for a great campaign!

That description is not consistent with the agreement as now claimed by plaintiffs, which purportedly also included a split of all expenses (not just the advertising costs) and a division of litigation work.  Instead, the email confirms the narrower focus of the parties on recruiting and its costs, while suggesting a split of fees received under the client

contracts resulting from that recruitment campaign. Later in that email chain, Mr. Kinsley asked Mr. Bross whether they should "[put] that letter agreement together that [Mr. Harvey] was talking about." After Mr. Bross suggested that they ask Mr. Harvey whether he already had a draft agreement, Mr. Kinsley stated as follows: "I think a lot of it will be moot as all three firms will be [on] the contracts for a lot of the cases." The most reasonable reading of that response by Mr. Kinsley is that documentation of the parties' agreement was unnecessary because the joint-representation client contracts would sufficiently cover that agreement. The parties' joint client contract (per the exemplar admitted into evidence) disclosed an equal split of the "total fee" among the three firms, and that contract was necessarily referencing only contingent fees at the percentage specified in that contract (i.e., one-third of the client's recovery). The client contracts' disclosure of that split would obviate or "moot" the need for documentation of the parties' oral agreement only if – as suggested by this email chain – the agreement similarly involved only a split of contingent fees received. When confronted with this email at trial, Mr. Kinsley denied without explanation that the client contracts in fact "mooted" the need to document the parties' agreement, but that denial was not credible in light of his additional testimony that he did not recall what he was thinking at that time. The Court finds that Mr. Kinsley's statement in the email is consistent with an understanding at that time that the scope of the parties' agreement was limited to contingent fees.

In March 2016, more than one year after the formation of the agreement in late 2014, Mr. Kinsley sent Messrs. Harvey and Bross a "quick draft of the terms of a MOU between

our firms," intended as a "memorialization of the agreement that our three firms . . . have

reached and have been operating under concerning the Syngenta MIR 162 Corn

Litigation."  The draft MOU included the following terms:

> 1.  The Firms will cooperate in and act as co-counsel for the inventory and future inventory of Syngenta MIR 162 corn litigation, including the cases currently filed and to be [filed] in the . . . Southern District of Illinois;
>
> 2.  The Firms shall divide the tasks associated with the litigation of these cases as agreed upon by the Firms;
>
> 3.  The Firms shall divide the net attorney's fees generated by the inventory of Syngenta MIR 162 cases (after the deduction of any MDL or other assessments and co-counsel fee percentages) equally.
>
> 4.  Expenses?

Plaintiffs note that no party challenged or objected to this draft, and they argue that it

therefore must represent an accurate description of the parties' agreement.  No party

consented to it either, however, and indeed the parties never executed a written letter

agreement or Memorandum of Understanding.  Moreover, the Court does not agree that

the reference to the "net attorney's fees generated by the inventory" of cases supports an

interpretation of the agreement that extends beyond a split of contingent fees only –

particularly because common-benefit fees are generally understood to be awarded not

because of any inventory of cases, but rather because of specific common-benefit work

performed.  In addition, the draft's description of the litigation-work term, in which the

parties would divide work as agreed, differs from the agreement as claimed by plaintiffs,

which purportedly included a promise to divide litigation work equally among the firms.

Finally, the one-word question about expenses in the fourth paragraph suggests that the

parties had not reached a firm agreement to split all litigation expenses, and thus is inconsistent with the version of the agreement claimed by plaintiffs.  Mr. Kinsley testified that he was not sure whether the parties would want to list specific expenses in that section, and that he was inviting comments by his question; but he was unconvincing in that testimony, as he failed to explain adequately why he would not have at least referenced a prior agreement to divide expenses (just as he had referred to dividing fees and tasks).  He did not testify that he had any particular intent at the time of the formation of the agreement beyond the terms stated in his draft MOU, which draft on its face does not support the interpretation sought by plaintiffs.

In January 2017, Mr. Kinsley yet again sent an email to Messrs. Bross and Harvey, in which he stated that he had been asked to produce "our memorandum of understanding in the corn cases," as they had talked about "for some time."  He then asked the others to agree that the firms "have agreed to pool all of each firm's Syngenta corn cases and split the net attorney's fees after paying referring counsel."  Mr. Bross responded that that statement was correct.  Again, however, Mr. Kinsley's email description does not provide evidence of an agreement to split fees other than contingent fees.  The reference to paying referral fees, which would arise with respect to particular clients, relates to contingent fees, as discussed above.  Mr. Kinsley was not asked at trial about his intent in using this language in the email.  This statement of the agreement also omits any reference to terms concerning a division of work or a division of expenses, and thus it is not consistent with the entire agreement as claimed by plaintiffs.  The Court finds that this email does not

15

support plaintiffs' interpretation, but rather is consistent with HGD's narrower interpretation.

In support of their position, plaintiffs rely heavily on language in a November 2015 written fee-sharing agreement executed by the three firms and the Domina law firm. The relevant Paragraph 4.4 states as follows:

> Like you, we will share in any compensation awarded for common benefit work to claimants who are not clients of your group or ours. This can occur only if a court determines that your firms and we perform services that provide a common benefit to claimants outside our groups of clients. If such common benefit work is compensated, our compensation will be strictly proportionate, on a time basis, to the work efforts of all of you collectively. If our time is 5% of all time of our collective group, we will be paid 5% of the common benefit fees, for example.

Plaintiffs' counsel argued in closing (and in cross-examination of Lew Garrison, who signed this agreement on behalf of HGD) that in Paragraph 4.4 the three firms agreed that Domina could share in a common-benefit award to any of the three, in proportion based on the "work efforts" or "time" spent by Domina (not solely based on Domina's *common-benefit* time), even if Domina itself did no common-benefit work. Plaintiffs further argue that use of the words "like you" provides evidence that the three firms similarly agreed to share common benefit fees in their own oral agreement from one year prior.

The Court does not agree with this interpretation of the Domina agreement. Considering the paragraph as a whole, the Court concludes that Paragraph 4.4 describes an agreement to share common-benefit fees in proportion to the common-benefit work performed by Domina and other parties. The provision states that such sharing would occur only if the three firms *and* Domina performed common-benefit work, and that language is

16

not consistent with an interpretation that would allow Domina to share in a common-benefit award even without performing any common-benefit work. Considering the entire paragraph, the final two sentences are most reasonably interpreted to refer specifically to common-benefit time spent by Domina and by the three firms. The provision is at least ambiguous in this respect, and the only evidence concerning the meaning of this provision came from Mr. Garrison, who testified that the provision was intended to allow Domina to receive common-benefit fees only to the extent that it performed common-benefit work. The Court therefore rejects plaintiffs' interpretation of this provision of the Domina agreement. And because the Domina agreement does not provide for a sharing of common-benefit fees except in accordance with common-benefit work performed, the "like you" language does not aid plaintiffs, who claim that the parties' oral agreement provided for the sharing of such fees regardless of who performed the work. Moreover, the fact that the Domina agreement included a specific provision spelling out how common-benefit fees would be handled actually supports HGD's contention that a term of such import, extending beyond the usual agreement to share contingent fees with referring counsel, would have been specifically and explicitly referenced (and likely documented) if the parties had actually intended to split any such fees. Accordingly, the Court finds that the Domina agreement provides further evidence favoring its narrower interpretation of the parties' oral agreement.

      3.    <u>Performance of the Agreement and Post-Agreement Conduct.</u> The Court's interpretation of the oral agreement is also supported by and consistent with the parties'

performance of the agreement and their post-agreement conduct. The Court agrees with HGD that the parties did not proceed to perform the agreement in accordance with plaintiffs' claimed version of the agreement. Most significantly, the parties did not split all expenses of the litigation equally, but rather split only the expenses incurred for recruitment and advertising. Plaintiffs note that HGD never asked them to contribute to the litigation expenses, but of course HGD would not have done so if it believed that no such agreement to split common-benefit expenses (or fees) existed. There is certainly no credible evidence that plaintiffs, in anticipation that common-benefit fees would be divided equally, offered to true up expenses in accordance with their understanding of the oral agreement. In fact, as stipulated by the parties, HGD was eventually awarded over $830,000 in common-benefit expenses, while plaintiffs CR and BH received $15,566.18 and $7,443.05 for common-benefit expenses. That great disparity in the expenses incurred by each party and plaintiffs' failure to assume equal shares of those expenses belie the existence of an agreement, as claimed by plaintiffs, that included a promise to share all litigation expenses equally.

Nor did the parties divide the litigation work equally, despite the inclusion of such a promise in the agreement as claimed by plaintiffs. Mr. Kinsley admitted that CR did not perform one-third of the litigation work. Plaintiffs testify that they asked HGD for litigation work to perform, but there is little documentary evidence of such requests. There is no evidence that plaintiffs complained that they were not getting an equal share of work or that they claimed that their agreement required such a division of work. Rather, Mr.

Kinsley conceded that the parties actually agreed to let HGD take the lead on doing motion practice and litigating the cases that were filed. Plaintiffs did perform some litigation work, including work in discovery and work with plaintiff fact sheets (PFSs); but plaintiffs did not identify any particular litigation work or strategizing that was not included in the joint application for common-benefit fees, and that application shows a significant disparity between the work performed by HGD and that performed by plaintiffs. The fact that plaintiffs conceded that they would ask HGD for work confirms that HGD was in charge of litigating the parties' joint cases and that neither the work nor the decision-making was shared equally among the parties. The Court finds that the testimony by Messrs. Kinsley and Harvey that they played an equal part with HGD in the making all decisions concerning the litigation of the cases was not credible. In contrast, Lew Garrison, who spearheaded HGD's litigation efforts, testified credibly in describing plaintiffs' contributions to the overall case, which efforts included some specific common-benefit work, but which mainly involved the recruitment of clients (which does not constitute common-benefit work, as more fully discussed below with respect to the declaratory judgment counterclaim). Plaintiffs insist that by their recruitment work, they contributed substantially to the overall effort by the three firms; but as HGD points out, Mr. Bross of HGD was also involved in that same recruitment work. The Court finds that the parties did not equally divide all of the work on the cases, nor did the quantity of plaintiffs work approach that of HGD. That unequal division supports HGD's version of the agreement and is inconsistent with plaintiffs' version, which required equal work by the parties.

Plaintiffs note that they did perform some litigation work, such as work completing PFSs, that was not directly tied to particular clients jointly represented by the three firms, and in closing argument, plaintiffs' counsel wondered why plaintiffs would have performed such work if their recovery of fees was limited to the joint clients. That work, however, is not inconsistent with an oral agreement that was limited to sharing contingent fees, as plaintiffs would still have at least two obvious incentives for performing such work: first, any work by plaintiffs on behalf of Syngenta plaintiffs generally might be compensated as common-benefit work; and second, any work that could support the litigation position and thus increase the ultimate recovery of the Syngenta plaintiffs would ultimately redound to the benefit of plaintiffs through increased contingent fees. Thus, the fact that plaintiffs may have performed some work in litigation not directly tied to jointly-represented clients does not support their interpretation of the oral agreement.

Plaintiffs' reactions to the Court's fee award structure, including the common-benefit and IRPA pools and the abrogation of individual contingent-fee contracts, further support HGD's position that the parties did not agree to split common-benefit fees equally. In March 2018, Mr. Kinsley sent an email to Messrs. Garrison, Bross, and Harvey in which he stated the following:

> The issue is that if it is a true fee petition and all contingent fee agreements are void, my practice area with a large swath of referral attorneys is going to be adversely impacted. Let alone being called on the carpet by my partners if all the work we did is essentially valueless.

In a later email in the chain, Mr. Kinsley stated, "Well I for one am fucked." These statements indicate that Mr. Kinsley's understanding was that CR's efforts in the litigation

was to be rewarded through contingent fees, with the voiding of contingent fee agreements making that work "essentially valueless." They are not consistent with an understanding that his firm would still be able to receive an equal share of fees awarded because of HGD's significant common-benefit work. Similarly, in October 2018, Mr. Harvey stated in an email as follows: "What a disappointment that project [the Syngenta litigation] turned out to be." Mr. Harvey made that statement after his firm had joined HGD's joint fee application seeking over $45,000,000 in attorney fees. As HGD argues, Mr. Harvey's outlook should not have been so gloomy if he in fact understood the parties' agreement to mean that BH would receive one-third of the substantial award sought by HGD in the joint application (after payment to the other joint applicants). Mr. Harvey was unable at trial to offer any credible explanation for that outlook if he in fact believed that plaintiffs were each entitled to one-third of common-benefit and other fees received by HGD. Nor was Mr. Harvey credible in testifying that he did hold that belief at that time. Rather, the Court finds that plaintiffs at that time did not understand their agreement to entitle them to equal shares of common-benefit fees.

Most damning to plaintiffs' position is the evidence of their interactions with HGD after the Court made its common-benefit fee award to HGD and its joint applicants (which ultimately totaled over $29,000,000). HGD proposed particular allocations to CR and BH, in the amounts of $1,300,000 and $200,000 respectively, and the parties engaged in multiple discussions about plaintiffs' share of the award. Even then, plaintiffs did not claim that they were entitled to two-thirds of the award under the parties' 2014 oral agreement.

Plaintiffs' witnesses from CR and BH testified that they in part relied on Mr. Bross's insistence to them that Mr. Garrison would "take care of them," and that they decided as a matter of strategy not to make such a claim under the oral agreement in trying to negotiate the amount of their allocations.  The Court finds, however, that that testimony – that they chose not to play their strongest bargaining card, that they decided not to point out that HGD was in fact legally obligated under the parties' agreement to pay them two-thirds of the award – was not credible, if in fact plaintiffs believed and understood the agreement to include an equal division of common-benefit fees.[4]  The Court finds that even after the Court's common-benefit fee award, plaintiffs did not understand the parties' oral agreement to include a promise to divide common-benefit fees equally.

\* \* \*

In summary, the totality of the context and circumstances relating to the parties' oral agreement, as found by the Court, support and lead to the Court's finding that plaintiffs have failed to satisfy their burden to prove that HGD agreed to an equal split of common-benefit fees received by any party.  Accordingly, the Court finds against plaintiffs and in favor of HGD on plaintiffs' claim for breach of contract.

---

[4]  There is some merit to plaintiffs' argument that Mr. Bross's credibility might be challenged on the basis that he had an interest in not being completely frank with Mr. Garrison concerning the terms of the parties' agreement, for fear of Mr. Garrison's disapproval.  The Court has not relied on Mr. Garrison's understanding of the agreement as received from Mr. Bross, however.  Moreover, Mr. Bross's credibility is not particularly relevant to the Court's consideration of the evidence, however, as there are no material differences between his testimony and that of Messrs. Kinsley and Harvey on which HGD (or the Court) relies.

### III.   Partnership Claim

#### A.   *Choice of Law*

Plaintiffs originally asserted their partnership claim under the Illinois Uniform Partnership Act, but they later added partnership and joint venture claims under Alabama law.  In their proposed findings and conclusions, however, plaintiffs concede that Illinois partnership law does not apply here in light of the provision in the Illinois act stating that relations between partners are governed by the law of the jurisdiction in which the partnership had its chief executive office.  *See* 805 Ill. Comp. Stat. 206/106(a).  Plaintiffs now assert their claim only under Alabama law.  Accordingly, plaintiffs have abandoned their partnership claim under Illinois law, and HGD is awarded judgment on that claim.

#### B.   *Applicable Law*

The Court thus turns to plaintiffs' partnership claim under Alabama law.  Under the Alabama Partnership Law, "the association of two or more persons . . . to carry on as co-owners a business for profit form a partnership, whether or not the persons intend to form a partnership."  *See* Ala. Code § 10A-8A-2.01(a)(1).  "A person who receives a share of the profits of a business is presumed to be a partner in the business . . . ."  *See id.* § 10A-8A-2.01(c)(3).

> This Court [the Alabama Supreme Court] has stated that there is no arbitrary test as to whether a partnership exists.  Instead, this Court looks to all the attendant circumstances in determining the existence of a partnership. A partnership arises only from an express or implied agreement among the parties and is never established by implication or by operation of law.  Indicia of the existence of a partnership can include intent and agreement to be partners, sharing of profits and losses, sharing management and community of interest, as well as other surrounding circumstances.

*See Penney v. Penney*, 355 So. 3d 303, 310 (Ala. 2021) (citations and internal quotations omitted).

In asserting this claim, plaintiffs argue that the parties' partnership took the form of a joint venture formed for the single undertaking of the Syngenta litigation.  *See In re Syngenta AG MIR 162 Corn Litig. (Crumley Roberts)*, 2023 WL 4405004, at *2 (D. Kan. July 7, 2023) (Lungstrum, J.) (noting that the elements of a partnership and the elements of a joint venture are virtually identical under Alabama law) (citing cases).

> A joint venture is an association of persons with intent, by way of express or implied contract, to engage in and carry out a single business venture for joint profit, for which purpose they combine their efforts, property, money, skill, and knowledge, without creating a partnership or a corporation, pursuant to an agreement that there shall be a community of interest among them as to the purpose of the undertaking, and that each participant shall stand in the relation of principal as well as agent as to each of the other coadventurers, with an equal right of control of the means employed to carry out the common purpose of the venture.

*See Charles J. Arndt, Inc. v. City of Birmingham*, 547 So. 2d 397, 399 (Ala. 1989) (quoting 46 Am. Jur. 2d *Joint Ventures* § 1 (1969)).  "As between the parties themselves, the relationship of joint venturers is a matter of intent." *See id.* at 400.

C.     *Analysis*

Plaintiffs argue that the parties joined together to litigate the Syngenta cases for joint profit, pursuant to the parties' agreement to divide fees; that the parties therefore entered into a joint venture or partnership; and that under Alabama's partnership statutes, they are entitled to a distribution of all profits at the termination and dissolution of the partnership. *See* Ala. Code §§ 10A-8A-8.01, -8.09.

24

HGD disputes that the parties formed a partnership or joint venture.  As it points out and as plaintiffs concede, the parties did not execute a written partnership agreement, no joint accounts were created for the parties, the parties did not file any joint tax returns, and the parties did not give a name to any partnership or joint venture.  As HGD further notes and the evidence confirms, the parties referred to themselves merely as "independent cooperating law firms" in the marketing materials they used to solicit joint clients.  HGD argues that the parties did no more than enter into an arrangement to share contingent fees.  The parties stipulated that they referred to themselves as a "consortium".  There is no evidence, however, that the parties referred to any "partnership" or "joint venture" – or referred to themselves as "partners" or "joint venturers" – either at the time they entered into their oral agreement or in any of the attempts to memorialize or document their oral agreement in a memorandum of understanding or by email.  Only Mr. Harvey of BH testified that the three firms referred to themselves and held themselves out as "partners".  He did not testify, however, that any party intended by such use to denote a legal partnership among the parties.  Finally, as noted and found above, the parties did not bear equal shares of litigation expenses, nor did they exercise joint control over litigation work.[5]

In insisting that the parties formed a partnership when they entered into their fee-sharing agreement, plaintiffs rely on the following statement by the Alabama Supreme

_____

[5] As HGD points out, it had co-counsel agreements with other parties as well (including the Onder firm), and plaintiffs did not explain how, if such arrangements always turned into partnerships, HGD could have also been in a broader partnership with plaintiffs that extended beyond the individual clients that retained plaintiffs and HGD.

Court: "Where an attorney retained on a contingent-fee basis to prosecute a claim engages another lawyer to assist in the litigation, upon an agreement to share the fee in case of success, otherwise to receive nothing, they become joint venturers." *See Wachovia Bank, N.A. v. Jones, Morrison & Womack, P.C.*, 42 So. 3d 667, 678 (Ala. 2009) (quoting 46 Am. Jur. 2d *Joint Ventures* § 50 (2006)).  Based on that statement, the Court agrees that to the extent attorneys have agreed to share contingent fees and jointly to represent a client, such an arrangement may be considered a joint venture under Alabama law.

As discussed above, however, the Court finds that the parties' oral agreement was limited to the sharing of contingent fees from their joint clients' cases against Syngenta, and that there was no agreement to share common-benefit fees awarded to a party.  Thus, the quoted statement by the Alabama Supreme Court does not apply to this case, in which a partnership is claimed with respect to fees other than contingent fees.  There are no indicia of a partnership or joint venture broader in scope than the arrangement to share contingent fees; nor was there an equal right of control with respect to litigation of the cases.  The Court therefore finds that the parties did not form any such broader partnership or joint venture – and specifically that the parties did not form any partnership or joint venture that would encompass common-benefit work in the litigation or fees awarded for such work.  Accordingly, the Court finds in favor of HGD on plaintiff's partnership and joint venture claim.

## IV.    **Declaratory Judgment Counterclaim**

In this action, plaintiffs did not assert a claim to recover any share of the common-benefit award to HGD other than their claim for a one-third share each.  Although HGD has disputed that plaintiffs are entitled to equal shares, it has conceded that each plaintiff is entitled to some lesser share as a joint applicant for the award.  HGD therefore asserted a counterclaim by which it seeks a declaratory judgment to determine the proper amount of each plaintiff's share.  Plaintiffs do not argue that the Court should decline to address the issue.  Because the Court concludes that the requested declaration of plaintiffs' proper shares of the common-benefit award would clarify the legal relations and settle any controversy among the parties concerning those shares, the Court in its discretion will make this determination and issue a declaratory judgment to resolve the issue.  *See State Farm Fire & Cas. Co v. Mhoon*, 31 F.3d 979, 983 (10th Cir. 1994) (noting factors for deciding whether to hear a declaratory judgment action).

Mr. Garrison testified that the parties did not have any specific agreement at or after the time of the joint fee application on how any common-benefit fee award would be distributed among the applicants; and plaintiffs have not asserted that any such agreement existed (and they did not offer any evidence of such an agreement), other than the oral agreement underlying plaintiffs' unsuccessful contract claim.  The Court therefore determines plaintiffs' shares of the common-benefit award in accordance with its prior orders (which have now been affirmed by the Tenth Circuit) pursuant to which the Court

awarded common-benefit fees from the Illinois common-benefit pool to the group that included HGD and plaintiffs CR and BH.

As noted above, on December 7, 2018, when it certified a settlement class and approved the global settlement of the cases against Syngenta, the Court awarded attorney fees in the amount of one-third of the settlement fund of $1.51 billion, using the Tenth Circuit's preferred percentage-of-the-fund method. *See In re Syngenta AG MIR 162 Corn Litig.*, 357 F. Supp. 3d 1094, 1110-17 (D. Kan. 2018) (Lungstrum, J.) (citing authority and bases for the award). On December 31, 2018, the Court adopted a structure by which it allocated the total fee award among three common-benefit pools (including 15.5 percent, or $78,016,666.67 to the Illinois common-benefit pool) and the IRPA pool while prohibiting any other recovery by attorneys pursuant to contingent-fee contracts, which methodology was subsequently affirmed by the Tenth Circuit. *See In re Syngenta AG MIR 162 Corn Litig.*, 2018 WL 6839380 (D. Kan. Dec. 31, 2018) (Lungstrum, J.), *aff'd*, 61 F.4th 1126 (10th Cir. 2023). In the fee-allocation order, the Court explained its general approach in part as follows:

> Creation of the IRPA pool allows the Court to recognize the contribution to the ultimate recovery made by the very existence of the huge number of individual claims, while at the same time limiting fees for those attorneys to a reasonable amount. Creation of the three common benefit pools allows for a reasonable allocation of the remainder of the fee award based on the attorneys' relative contributions to the recovery, including the actual litigation of the claims against Syngenta and the negotiation and defense of the settlement.

*See id.* at *5. The Court proceeded in that order to set forth guidelines for the further allocation of fees from the common-benefit pools to applicant firms as follows:

28

In the R&R, the special master has not attempted to define the scope of the common benefit work that will be compensated from the three common benefit pools in the next phase of allocation, except that the master has made clear her recommendation that such work should not be limited merely to work approved and audited by Kansas or Minnesota leadership pursuant to CBOs entered by the courts.   The Court adopts that recommendation, and it agrees that the three common benefit pools shall be allocated among particular attorneys based on any work that benefitted the settlement class, whether or not such work was performed pursuant to any CBO.  It is this understanding of common benefit work that the Court has applied in allocating percentages of the total attorney fee award to the three common benefit pools. . . .

Moreover, although allocation from the three common benefit pools will take place in the next phase, the Court deems it appropriate to make a few remarks concerning how the three courts will consider certain types of work in making that allocation, with the intent that such considerations be consistent across the three pools.  First, the courts will consider as common benefit work any work, either in litigating the claims or in pursuing the settlement with Syngenta, that contributed to the settlement and the ultimate recovery by the settlement class, thereby benefitting the entire settlement class.   Second, as mentioned above, the courts do not consider work performed in recruiting clients to have inured to the common benefit of the settlement class.  Third, work performed for particular individual clients may still be considered common benefit work if that work provided a benefit to the entire settlement class.  For instance, many objectors have argued that work to complete and submit plaintiff fact sheets (PFSs) pursuant to court orders should be considered common benefit work for purposes of allocation from the common benefit pools.  The courts agree that work completing a significant number of PFSs that were actually submitted to courts or Syngenta could benefit the entire settlement class.  In considering such work (and other work), however, the courts will be mindful that the work would not reasonably have been undertaken at the highest attorney rate, for instance because much of the work could reasonably have been completed by lesser-experienced attorneys or even by paralegals or other staff.  The same would be true, for example, for work drafting identical complaints (after drafting the first one) for multiple plaintiffs, or work submitting claims (in light of the ease of doing so).  In short, although much work may qualify as common benefit work if sufficiently impactful or if on behalf of a large number of plaintiffs, not all common benefit work will be weighed equally in the allocation from the common benefit pools.

*See id.* at *14 (footnote omitted).

On August 19, 2019, Judge Rosenstengel of the United States District Court for the Southern District of Illinois issued an order by which she further allocated attorney fees from the Illinois common-benefit pool. *See In re Syngenta Mass Tort Actions*, 2019 WL 3887515 (S.D. Ill. Aug. 19, 2019) (Rosenstengel, J.). After noting this Court's guidelines for awarding common-benefit fees (quoted above), Judge Rosenstengel rejected the methodology employed by a special master in his report and recommendation concerning the allocation, in part because the special master failed to heed those guidelines in improperly considering client acquisition costs and in failing to differentiate between the types of work underlying the claimed common-benefit hours. *See id.* at *1, 6. Judge Rosenstengel proceeded to allocate 43.4 percent of the Illinois common-benefit pool to "The Garrison Group" that included HGD, CR, BH, and six other firms. *See id.* at *9. In so doing, she noted that she was giving "little weight to hours for pre-settlement communications with clients, PFS work, and assisting clients in perfecting claims, and afford[ing] significantly less weight to the non-attorney hours compared to the attorney hours." *See id.* She then described the group's contributions to the overall recovery, on which she based her allocation, as follows:

> As to Garrison's contributions, the group was at the forefront of the Illinois Syngenta litigation. They were appointed lead counsel in *Poletti*, where they secured important rulings on personal jurisdiction and the economic loss doctrine. Garrison's success benefitted all Illinois plaintiffs – state and federal – as well as plaintiffs in other state courts across the country. Furthermore, Garrison was engaged in a joint-prosecution agreement with the Kansas MDL leadership and assisted them in document review. Additionally, Garrison presented 44 farmers for deposition, produced approximately 350,000 pages of farmer documents, and were engaged in early settlement discussions. Finally, Garrison pursued lines of questioning

30

at depositions that were used at the Kansas class trial where the jury returned
a plaintiffs' verdict . . . .

*See id.* By Memorandum and Order of November 19, 2019, this Court declined to disturb

the allocations by Judge Rosenstengel, and it made the awards from the Illinois common-

benefit pool in accordance with her order – including the award to the HGD group that is

at issue here. *See In re Syngenta AG MIR 162 Corn Litig.*, 2019 WL 6134520 (D. Kan.

Nov. 19, 2019) (Lungstrum, J.).

Before it applies the common-benefit principles and guidelines set forth and applied

in the prior orders, the Court rejects plaintiffs' argument that, even if the parties' 2014 oral

agreement did not cover an award of common-benefit fees, the Court should nevertheless

award each plaintiff an equal one-third share under principles of equity.  Plaintiffs pithily

argue that equity means equality, and they insist that such awards would fairly reward their

contributions to the overall Syngenta litigation.  The Court does not agree, however, that

plaintiffs should receive equal one-third shares.  As conceded by plaintiffs in making this

argument, their primary contribution lay in their efforts to recruit clients to build up the

greatest stable of individual cases against Syngenta.  They contend that HGD would not

have been in a position to perform all of its common-benefit work without those efforts;

but plaintiffs failed to show at trial that the quantity of the clients jointly represented by

plaintiffs and HGD made a material difference in how the litigation was ultimately

resolved.  Nor was the eventual common-benefit award to the HGD group based in any

significant way on those client acquisition efforts.  To the contrary and as noted above,

Judge Rosenstengel made clear that she was not considering client acquisition work in

making her allocations.  Rather, in concluding that the HGD group's allocation should be substantially increased from the allocation recommended by the special master, she relied on the litigation work that HGD (and Mr. Garrison in particular) performed, including with respect to motion practice, discovery (including lines of deposition questioning used at the Kansas class trial), and settlement negotiations.

Moreover, as HGD noted at trial, not only did it take the lead in litigating the cases, it also performed substantial work acquiring the joint cases, as Mr. Bross worked alongside Messrs. Kinsley and Harvey in recruiting clients.  Further, it is not true that HGD could not have performed its common-benefit work without plaintiffs' recruitment efforts; as HGD showed at trial, the parties' joint cases were not required for the filing of the *Poletti* case in Illinois, and HGD could certainly have ascended to a leadership role within the entire litigation with only that case and without the joint cases.  Ultimately, plaintiffs have failed to show that their recruitment efforts were so impactful, either with respect to the Syngenta plaintiffs' ultimate recovery or the common-benefit fee award at issue, that they should receive the same shares of the common-benefit award received by HGD.

On a more basic level, the Court rejects plaintiffs' argument for equal shares because the bulk and primary focus of their work – recruiting clients – does not constitute common-benefit work for the purpose of an allocation of fees from the common-benefit pools, as the Court instructed in its initial fee order.  Accordingly, the analogy of a divorce case used by plaintiffs' counsel in closing argument – with plaintiffs as the one spouse who provided support while the other spouse eventually achieved financial success – is not apt, as the

Court has chosen to award fees through different mechanisms, and plaintiffs' recruitment work will still be rewarded by allocations from the IRPA pool. In addition, the Court has ruled that there was no partnership (or in the language of the plaintiffs' metaphor, no marriage) here with respect to this award of fees; and plaintiffs are law firms that were in a position to protect themselves before choosing to join HGD's attorney fee application instead of applying separately.

The Court thus proceeds to allocate common-benefit fees to plaintiffs in accordance with its prior guidelines, based on the evidence at trial. Plaintiffs offered into evidence the parties' joint attorney fee application (on behalf of "Team HGD", comprised of the parties and other firms), including the attached affidavits and time summaries. Plaintiffs also submitted evidence of their attempts to estimate the number of hours that Messrs. Kinsley and Harvey actually spent on the litigation (including recruitment work) beyond the hours reflected in the joint application. Plaintiffs have not, however, suggested or argued in favor of allocations in specific amounts (other than their argument for equal one-third shares) or otherwise attempted to value their common-benefit contributions.

HGD did offer such an analysis of plaintiffs' common-benefit time. HGD argues, based on its calculations, that CR and BH should receive no more than $845,747.78 and $178,455 respectively from the common-benefit fee award. As explained at trial by Mr. Garrison, HGD arrived at those figures by starting with the hours claimed by plaintiffs in

the joint fee petition;[6] adjusting some hourly rates to be consistent with plaintiffs' fee affidavits; eliminating some non-common-benefit time in accordance with the Court's guidelines (such as work related to recruitment or to individual cases); limiting some hours by temporary staff to the hours actually worked as shown in plaintiffs' payroll records; and applying a multiplier of 2.5 to attorney time. Mr. Garrison testified that he believed those calculations were generous because he allowed for the top claimed billing rate for each biller, regardless of the year in which the work was performed; the 2.5 multiplier was high compared to multipliers used for other common-benefit fee awards; and he did not remove any common-benefit time, even though he believed that hours were inflated and that much of the work was "me too" work that was of lesser value under the Court's guidelines. Ultimately, Mr. Garrison testified that the calculated totals represented his best estimate regarding the value of plaintiffs' common-benefit work.[7]

----

[6] In the fee application submission, CR claimed 3,792.6 hours by attorneys and non-attorneys, but that figure included hours that would not necessarily be deemed common-benefit time, such as the 1,678 hours for setting up and reviewing individual case files. The total hours also included 1,064 hours by temporary staff to review documents and 724 hours by paralegals working on PFSs. CR claimed approximately 223 hours for work by Mr. Kinsley. BH claimed only 177.42 hours, all of which was attorney time.

[7] HGD also demonstrated at trial that the totals as "reconstructed" by Messrs. Kinsley and Harvey were not reliable. Both men conceded that they did not keep contemporaneous time records, and they often assigned one- or two-tenths of an hour for emails (including a few obviously personal emails) even if they comprised only a word or two or were within the same email chain. The records for Mr. Kinsley's email time included over 2,400 emails for a five-day period in March 2015, to which he assigned some time – even though assigning his minimum of one-tenth of an hour to each would total more than 240 hours for those five days. The Court finds that these estimates offered by plaintiffs were not credible.

Mr. Garrison's methodology and conclusions were not unreasonable. It makes sense at least to start with a lodestar-based analysis, particularly given the absence of any specific allocation figures suggested by plaintiffs. The Court agrees with plaintiffs, however, that their ultimate awards should not be determined solely by lodestar calculations. As plaintiffs note, Judge Rosenstengel's allocation to the HGD group – the award being divided here – was based on the fee application submissions and not on the downward modifications made by Mr. Garrison for trial. More importantly, in its fee orders this Court has followed the percentage-of-the-fund approach favored by the Tenth Circuit, instead of a strict lodestar-and-multiplier methodology, and Judge Rosenstengel used the same approach in allocating specific percentages of the Illinois pool to the HGD group and other applicants. Thus, for instance, Judge Rosenstengel allocated one percent of the Illinois pool to an applicant whose contributions generally did not benefit the settlement class at large. In that way, the Court seeks to determine the approximate percentage of the Illinois common-benefit pool that plaintiffs would have been awarded, based on their contributions to the settlement class's ultimate recovery, if they had applied separately for fees.

The Court concludes that CR should be awarded $1,300,000.00, or approximately 1.67 percent of the Illinois pool; and that BH should be awarded $200,000.00, or approximately 0.25 percent of the Illinois pool. Those figures are higher than the figures reasonably calculated by Mr. Garrison under a lodestar analysis; but they are the exact amounts that Mr. Garrison testified that he originally sought to distribute to plaintiffs from

the total common-benefit award.  Mr. Garrison testified that he believed at that time that those amounts fairly compensated plaintiffs for their common-benefit contributions.  Mr. Garrison testified at trial that he now believes that his calculations of a lodestar amount accurately reflect plaintiffs' proper common-benefit time.  Again, however, the Court would not use a rigid lodestar approach in determining an applicant's common-benefit *contribution* (as opposed to determining its common-benefit *time*), and neither did Mr. Garrison in determining his own further allocation from the common-benefit award.[8]  The Court concludes that plaintiffs have not shown that their contributions justify awarding *more* than those amounts, including because they did not attempt to justify an award of any particular percentage; but by Mr. Garrison's testimony, HGD has effectively conceded that it believed at the time of the award that allocations of $1,300,000 and $200,000 to plaintiffs fairly reflected plaintiffs' common-benefit contributions.  The Court finds that that in-the-moment analysis of what plaintiffs should receive by Mr. Garrison provides a more appropriate measure than the figures he derived once a lawsuit had been filed.  The Court therefore adopts Mr. Garrison's prior determination, and it issues its declaratory judgment accordingly.

---

[8]  The evidence indicates that Mr. Garrison distributed common-benefit fees to other joint applicants in similar rounded-figure amounts.

IT IS THEREFORE ORDERED BY THE COURT THAT defendant Heninger Garrison Davis LLC is awarded judgment on plaintiffs' claims other than those asserted under the Alabama Uniform Voidable Transactions Act, which claims remain pending.

IT IS FURTHER ORDERED BY THE COURT THAT a declaratory judgment shall be issued to the effect that plaintiff Crumley Roberts, LLP should receive a total of $1,300,000.00 from defendant from the common-benefit fee award, and that plaintiff Burke Harvey, LLC should receive a total of $200,000.00 from defendant from the fee award.

IT IS SO ORDERED.

Dated this 8th day of December, 2023, in Kansas City, Kansas.

　　/s/  John W. Lungstrum
Hon. John W. Lungstrum
United States District Judge